FRIEL v. NATIONAL LIBERTY INS. CO. OF AMERICA.

Civil Action No. 5670.

District Court, E. D. Pennsylvania.

May 12, 1947.

Michael C. McManus, of Philadelphia, Pa., for plaintiff.

Horace M. Schell, of Philadelphia, Pa., for defendant.

BARD, District Judge.

This is an action on a policy of fire insurance. On the basis of the pleadings and the evidence produced at the trial of this cause, I make the following special

Findings of Fact

1. The plaintiff is a citizen of the Commonwealth of Pennsylvania.

2. The defendant is a corporation duly organized and existing under the laws of the State of New York, and maintains a place of business at Philadelphia, Pennsylvania.

3. The amount in controversy exceeds the sum of $3,000, exclusive of interest and costs.

4. On August 1, 1940 the defendant issued its policy of fire insurance No. 1876 for five years, with extended coverage endorsement, in the sum of $25,000 on the property situate Northeast corner of Kentucky and Pacific Avenues, Atlantic City, New Jersey, designated and known as

"Kenapac Court Apartments". The plaintiff's father, Edward H. Friel, was then the owner of the property and was the named assured in the policy.

5. The plaintiff, E. Harmon Friel, became the legal owner of the "Kenapac Court Apartments" by deed dated November 24, 1943.

6. By endorsement dated December 1, 1943, the defendant recognized Edward H. Friel and/or E. Harmon Friel, as interest may appear, as assured and owner of the property covered by the policy No. 1876, subject to all the terms and conditions therein contained.

7. The policy of insurance was countersigned and delivered at Atlantic City, New Jersey, by William Bouch and Sons.

8. The policy contained the New Jersey Standard Percentage Co-Insurance Clause which provided that if, at the time of fire, the whole amount of insurance on the property covered by the policy should be less than eighty per cent. of the actual cash value thereof, the defendant should, in case of loss or damage, be liable for only such portion of such loss or damage as the amount covered by its policy should bear to the said eighty per cent. of the actual cash value of such property.

9. The policy further limited the liability of the defendant to no greater proportion of any loss to the described property than the amount thereby insured bore to the whole insurance, whether valid or not, covering such property.

10. The total amount of insurance carried on the property was $150,000, of which total $25,000 was insured by the defendant.

11. Prior to October 23, 1941, discussions arose between Edward H. Friel, the plaintiff's father and predecessor in title, and Benjamin Bouch, his real estate management agent, who was also a policy writing agent for the defendant, as to whether the insurance carried on the premises in question should be increased. As a result of these discussions, Edward H. Friel declined to consider increasing the amount of insurance on the property.

12. In October 1941, Benjamin Bouch requested the defendant to furnish an appraisal of the insured property. The de-fendant replied by letter dated October 23, 1941, over the signature of M. J. Hartelius. The letter was addressed to William Bouch and Sons, attention of Benjamin Bouch, and stated that after inspecting and measuring the premises in question, the writer estimated that the present day replacement value of the structure would be about $174,865; eighty per cent. value $139,900, said values having been computed on the basis of present day replacement cost per cubic foot less a small percentage for depreciation of material.

13. Joseph Bouch, a member of the firm of William Bouch and Sons, exhibited the defendant's letter of October 23, 1941, to the plaintiff within a week from the date it was received, and between October 23, 1941, and February 27, 1944, the plaintiff and Joseph Bouch had conversations concerning the letter.

14. On February 27, 1944, the "Kenapac Court Apartments" were damaged by fire.

15. Following the fire, the Fire Companies' Adjustment Bureau, Inc., of Philadelphia, which represented all of the insurance companies on the risk, determined that the sound value of the damaged building was $236,671.90, for the purpose of the adjustment. The amount of the loss was determined to be $114,959.63, based on estimates furnished by a representative of the assureds and a representative of the insurance companies.

16. By virtue of the New Jersey Standard Percentage Co-Insurance Clause, which had been incorporated into all the policies covering the risk, it was determined by the adjusters that $91,075.15 was payable to the assureds by all of the companies together. To that amount was added $6,924.85 with the approval of the companies, making a total of $98,000 payable to the assureds.

17. At meetings which were held between the plaintiff and the adjusters representing the various companies on the risk following the loss, the defendant's letter of October 23, 1941, was produced by the plaintiff and discussed concurrently with the problem of settlement; and in correspondence with the adjuster for the defendant company, this letter was brought to the latter's attention.

18. On September 26, 1944, the plaintiff and Edward H. Friel submitted their proof of loss, under oath, to the defendant. The proof of loss stated that the cash value of the premises at the time of the fire was $236,671.90, and that the whole loss and damage, for the purpose of this adjustment, was $98,000. The assureds claimed of the defendant the sum of $16,333.34, or one-sixth of the loss and damage, plus $209.40 of unearned premium, a total of $16,542.74.

19. On October 19, 1944, the defendant issued to Edward H. Friel and E. Harmon Friel and Guardian Life Insurance Company of America, the latter as loss payee, its draft in the sum of $16,542.74.

20. Edward H. Friel, E. Harmon Friel, and the Guardian Life Insurance Company of America endorsed the draft beneath a printed statement on the reverse side thereof which read: "In consideration of the sum hereby paid, all claims and demands whatsoever against National Liberty Insurance Company of America under this policy by reason of the within mentioned claim for loss and damage, are released, settled and forever discharged."

21. The defendant's draft, when presented, was duly paid by the defendant.

## Discussion

In the present action, the plaintiff seeks to recover from the defendant the difference between $25,000, the face amount of defendant's policy of insurance, and $16,333.34, which the plaintiff was actually paid thereunder. Plaintiff was not paid the face amount of defendant's policy by operation of the New Jersey Standard Percentage Co-Insurance Clause, under which the amount of payment under the policy was reduced because the total insurance carried on the damaged premises—$150,000—was less than eighty per cent. of $236,671.90, which was determined, in the course of adjustment, to have been the sound value of the building as of February 27, 1944, the date of the fire.

The plaintiff bases his case on the doctrine of equitable estoppel. He points to the fact that the defendant valued the property at $174,865 in its letter of October 23, 1941. He contends that he relied on that valuation in determining how much insurance should be carried on the building, and that the defendant is therefore estopped to deny that the property did in fact have a valuation of $174,865 on February 27, 1944, when the fire occurred.

I am of the opinion that the doctrine of equitable estoppel is not applicable to the instant case. As I understand it, the doctrine of equitable estoppel is intended to prevent a party from denying the truth or accuracy of that which he had previously asserted, or from assuming a position which is inconsistent with that which he had previously taken. Analysis of the facts of the instant case will reveal, I think, that the defendant did not, subsequent to the fire, attempt to deny the truth or accuracy of what it had previously asserted, nor did it seek to assume a position which was inconsistent with that previously taken.

In its letter of October 23, 1941, the defendant gave its estimate of the *present day* replacement value of the building at $174,865. The defendant has never attempted to deny that the replacement value of the building, as of *October 23, 1941,* was $174,865. What the defendant *does* now assert is that on *February, 27, 1944,* the replacement value of the building was $236,671.90.

I can find in defendant's position neither inconsistency nor a denial of what it had previously stated. It is a matter of common knowledge that the replacement value of a building is subject to fluctuation, and it is equally well known that building replacement costs did actually rise appreciably between October 23, 1941, and February 27, 1944.

I cannot see how the plaintiff can seriously contend that the replacement value of the building did not increase between October 23, 1941, and February 27, 1944. He does suggest, however, that the defendant, having once submitted an estimate of the replacement value of the building, was under an obligation to apprise the plaintiff of any subsequent increase in valuation. This argument must be rejected, because it misconstrues the nature and extent of defendant's undertaking in writing the letter of October 23, 1941. That letter purported to be nothing more than an estimate of the present day replacement value of the

764

property. Nothing that the defendant said or did could have led the plaintiff to believe that the defendant would furnish him with any further information on the subject of valuation, nor does it appear that the plaintiff ever asked for such information. Nor can I ascribe to the defendant the expectation that the plaintiff would continue to rely on the valuation given on October 23, 1941, for an indefinite period of time, or until he was advised of a change therein; on the contrary, the defendant, as a reasonable insurer, was certainly entitled to expect that the plaintiff, as a reasonable property owner, would realize that the valuation of the property would necessarily vary with subsequent changes in economic conditions.

My conclusion then is that the doctrine of equitable estoppel may not be invoked in support of plaintiff's claim. In view of the foregoing discussion, it is unnecessary for me to consider whether all of the necessary elements of equitable estoppel are present in the instant case, or whether the provision of the policy covered in Finding of Fact No. 9 would constitute a partial defense to the present action.

### Conclusions of Law

1. This Court has jurisdiction of the subject matter and the parties in the instant case.

2. Judgment will be entered in favor of the defendant.